RECREATION CLUB, INC., et al. v. MILLER et al.

(In Banc. Jan. 26, 1942.)

[5 So. (2d) 678. No. 34867.]

John G. Burkett, of Jackson, and Quitman Ross, of Laurel, for appellants.

**Deavours & Hilbun,** of Laurel, for appellees.

**Alexander, J.,** delivered the opinion of the court.

Alleging that prosecution had been begun and further action had been threatened by the mayor and commissioners of the City of Laurel, appellant filed his bill for injunction to prevent the continuance of such course. It was alleged that the complainants were operating a recreation club with a restricted membership, where such members could enjoy such games as checkers, dominoes, pool and other recreations; that no charges was made for such games, but that the members were granted the privilege of making donations to the management. The record discloses that the members were not stockholders, and that the outstanding stock, consisting of twenty shares, was held by the four individual complainants.

The recreational equipment consisted of one table for checkers, two for dominoes, automatic music machines

and other similar devices, and seven pool or billiard tables. Although unquestionably a poolroom in a popular sense, our inquiry is directed first to whether it is a poolroom within the meaning of our statutes and of the ordinances of the City of Laurel.

In Crittenden v. Booneville, 92 Miss. 277, 45 So. 723, 724, 131 Am. St. Rep. 518, the municipality was held without power to prohibit the operation of poolrooms, since the statute then applicable did not specifically authorize such prohibition. The right to proscribe poolrooms in the exercise of the police power (recognized in Murphy v. People of State of California, 225 U. S. 623, 32 S. Ct. 697, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153) was conceded in Corinth v. Crittenden, 94 Miss. 41, 47 So. 525, where the right of the municipality was derived from a special charter. Thereafter, under chapter 200, Laws of 1910, the pre-existing statute was amended so as to supply the authority to prohibit poolrooms, the omission of which was the controlling factor in Crittenden v. Booneville.

In 1938 the City of Laurel passed an ordinance making it unlawful ''for any person, persons, firm, corporation, club and/or association to operate or cause to (be) operated within the corporate limits of the City of Laurel, Mississippi, any club poolroom or club billiard room or club pool table or club billiard table or tables or any association poolroom or association pool table or association billiard room or association billiard table or tables in the City of Laurel, Mississippi, wherein or whereby membership dues are charged or paid directly or indirectly and/or the same is supported by means of voluntary contributions made by persons playing billiard games or pool games therein, or whereby any profit inures to any person or any corporation organized for profit.'' Such ordinance would seem to cover the case here with exactness, but we do not so decide, since the trial court held same to be without statutory authority and void, and referred his decision to a prior ordinance adopted June 6, 1922. At the time of the adoption of this ordinance, the act of

March 24, 1922, was in effect. This act, which is section 2416, Code 1930, specifically authorizes municipalities to ". . . prohibit . . . billiard tables, poolrooms . . ." Even though we follow the chancellor back to the ordinance of June 6, 1922, for such authority, it would be sufficient basis for dissolution of the injunction, provided the establishment here is adjudged a "pool room," since the ordinance of 1938 is made cumulative, and specifically keeps in force the prior ordinance if the latter is adjudged void.

We pass, therefore, to a consideration of the question whether the appellants were operating a poolroom within contemplation of the ordinance of 1922, and Code 1930, section 2416.

In answer to appellant's contention that the club is not subject to prohibition as a public poolroom, attention has been directed to the fact that no fixed charge is made for the right to play. In this connection it is appropriate to consider a silent but significant actor in the scene, to-wit, a small jar or box maintained and periodically circulated among the players for their convenience in making proper "donations" in appreciation of the privilege of playing. This interesting device seems to have a fixed orbit whose cycle is nicely synchronized so as to coincide with the periodic lull which comes between the completion of one game and the beginning of another. The normal rhythm of its appointed course attains its zenith of maximum visibility during this interval when the distraction of the players by the tension of actual play is at its lowest ebb, and when ignorance of its presence may be affected only with greatest difficulty. The practical phase of its rhythmic appearance upon the respective tables is that its presence constitutes at once an obstacle to further play and an incentive to further pay. Difficulties attending further recreational procedure are both physical and psychological. It is true that the management is quoted as conceding that participation in the ceremony is purely voluntary, and that such cooperation is no prerequisite to

continued play. Yet freedom to ignore its appeal is vouchsafed by the same authority which retains the right to suspend the membership of any member at any time. This court need not draw heavily upon judicial knowledge to conclude that the management would with difficulty restrain the temptation to discontinue the membership of those whose reaction to its benevolent appeal was found to be negative. A superficial knowledge of human nature would convince the most skeptical that an alert entrepreneur would be vigilant to avoid the fostering among the membership of a spirit of indifference to the commercial ideal of give and take. It is not improbable that the learned chancellor found that those in whom the presence of the donation box failed to induce currents of charity, and who tolerated its presence with an unprofitable complacency, would not only lose caste but become patrons in a too technical sense. Unquestionably the players early became aware that it would be a tactical error to ignore its presence, and that proper recognition of a contrary policy was one of the "rules" with which in the membership card they "agreed to comply." To the sensitive perception of experienced members the box was not seen as tendered to, but brandished at, them, and thereby constituted a direct assault upon their own composure, thus impairing their ability to yield completely to their own impulses.

In the membership card itself the management reserved the right to curb the privileges of any member who reserved the right to curb his generosity. That such considerations were prominent in the mind of the trial court is readily deduced from the circumstance that the membership fee was conservatively placed at one dollar a year, while the actual expenses for salaries alone was $200 a month. It is also revealed that while a sizable income is derived from musical and other slot machines, the chief source of profit is the pool tables, which produce approximately $300 monthly. So that when it is seen that the overhead expense, in addition to salaries, in-

cludes rental upon substantial quarters 150 feet square, maintenance of the gratuitous recreational facilities, including a checker table, two domino tables, magazine rack, a library of "twenty odd books by famous authors," and unpaid balances upon an initial investment of $6,000, the management could be expected to rest its financial future rather heavily upon the little box and the strength of its appeal. By periodic exposure of the members to this symbol of the cooperative spirit their interest in the continued good will of the management could be readily gauged. The trial court was warranted in assuming that such coveted good will was in inverse ratio to the thrift of the members, and that the cultivation of an habitually stoical indifference to its subtle pressure presaged an early severance of a relationship which would cease to be pleasant because no longer profitable.

In adjudging the classification of the establishment as a poolroom it is not without significance that the ratio of pool or billiard tables to checker boards was seven to one. Although the players at the latter were occasionally subjected to pulling power of the jar, its circulation in this less productive sector constituted at most a purely formal deference to a consistent routine policy, and those who engaged in playing pool were accorded a preferential status. It was concededly in the latter orbit that its oscillations were regular and insistent. It is unnecessary further to intimate our views that contributions thereto were voluntary in only a highly figurative sense. We do not treat lightly a factor that is serious enough to constitute a controlling principle of our decision. It has been purposely elaborated so as to reveal both its import and its importance. It would be a dulled intellect indeed which would be insensible to the plain subterfuge involved, or would fail to detect as implicit in this simple ceremony a degree of compulsion from which all traces of almsgiving had been refined.

We hold therefore that when the use of a poolroom is restricted to those who pay merely nominal dues, but

whose regular contributions are expected, invited and depended upon as a part of the income of the owners in whose profits the members do not share, it is a poolroom within the meaning of the quoted ordinance, and of Code 1930, section 2416. Our contention is necessarily confined to the case here presented, and is not to be so construed as to extend to the private ownership and use of pool or billiard tables by individuals or bona fide clubs and associations, where such games are furnished as a privilege available to a bona fide membership, and not for private gain.

The temporary injunction granted to the appellant was properly dissolved.

Affirmed.